# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| **REBEL ATHLETIC INC,** <br><br> *Plaintiff*, <br><br> v. <br><br> **JIM LUNDBERG D/B/A CS ATHLETIC D/B/A CHEERSTIX,** <br><br> *Defendant*. | **Civil Action No. 1:22-cv-03330** <br> **Hon. John R. Blakey** |

**REPLY EXPERT REPORT
OF ROB WALLACE
January 25, 2024**

I. **Introduction**

1. I was asked by attorneys for Rebel Athletic ("Plaintiff"), Ni, Wang & Massand, PLLC to review the rebuttal report of Brian M. Sowers (referred to as "the Sowers report") regarding the matter of *REBEL ATHLETIC INC. v. JIM LUNDBERG D/B/A CS ATHLETIC D/B/A CHEERSTIX* ("Defendant"*)*. The Sowers report is a rebuttal of the report that I filed in this matter, dated October 23, 2023. I was asked to provide my analysis of the Sowers report and the opinions expressed in it, as outlined below.

2. My opinions consider the Sowers report, the information provided to me, the survey findings for the report that I submitted in this matter, and my over 40 years of brand identity and brand communications expertise for a large number of consumer brands and services.

3. This report constitutes my findings as outlined below. I reserve the right to supplement my opinions based on any additional information that provides greater insight into the matters examined.

4. I have analyzed each issue expressed in the Sowers report in the order in which these issues were addressed in the report.

II. **Purported Improper Survey Universe**

5. Mr. Sowers suggests that the screening criteria used for the survey I conducted in my report was improper in that it required respondents to have purchased cheerleading backpacks within the last 12 months and plan to do so again in the next 12 months. Mr. Sowers states, *"this screening criteria would arbitrarily exclude individuals who have not purchased a cheerleading backpack before, but are likely to do so in the next 12 months."*

6. As confirmed by the Reference Guide on Survey Research, "…the relevant population in some disputes may include all prospective and past purchasers of the plaintiff's goods or services."[1] My survey universe included the relevant consuming public of cheerleading backpacks. As my report cites, the Reference Manual on Scientific Evidence, Third Edition West Group, St. Paul, MN, 2011 ("Reference Manual"), prepared for the Federal Judicial Center, states on page 376, "One of the first steps in designing a survey or in deciding whether an existing survey is relevant is to identify the target population (or universe). The target population consists of all elements (*i.e.*, objects, individuals, or other social units) whose characteristics or perceptions the survey is intended to represent."[2] The Sowers report's critique suggests that my survey universe should have included those that

---

[1] Reference Guide on Survey Research, Shari Seidman Diamond, page 376
[2] Reference Manual on Scientific Evidence, Third Edition West Group, St. Paul, MN, 2011

2

had never purchased a cheerleading backpack before. I disagree with this critique. It is well documented that a proper survey universe includes past purchasers of the products in question. "The appropriate universe should include a fair sampling of those purchasers most likely to partake of the alleged… goods or services." [3] Those that had never purchased a cheerleading backpack would not be part of the relevant consuming public. Of concern with Mr. Sowers' proposed approach is that the opinions of those that had never purchased a cheerleading backpack would not be based on actual purchase experience but rather on conjecture, and therefore, these opinions would be irrelevant to the mindset of proper survey respondents.

7. Sowers incorrectly argues that my survey universe not including those that had never purchased a cheerleading backpack made this survey's universe *"under inclusive[.]"* As mentioned, my screening criteria included both past and potential future purchasers. It only excluded those who had no purchase experience at all with cheerleading backpacks, which is proper in that they are not among the relevant *consuming* public.

### III. Purported Improper Logo Stimuli

8. Sowers also suggests that including the Rebel star logo in the research stimuli conducted for my report invalidated the survey because the Rebel star logo is not part of the Rebel trade dress. I understand that the Rebel star logo is not an identified component of the stated Rebel trade dress, but if this logo were to have been removed, then this manipulated stimuli would not represent the Rebel product as it is actually engaged during the point of purchase and in its daily use, which could have invalidated this stimuli and its survey results. The Sowers report actually agrees with this criterion in its citation of McCarthy on Trademarks and Unfair Competition. In paragraph 52, the Sowers report cites: *"Professor McCarthy explains that '[t]he closer the survey context comes to marketplace conditions, the greater the evidentiary weight it has.'"* I agree and note that if we had extracted the Rebel star logo from the product presentation it would misrepresent how the product is actually engaged in the marketplace. That is why the stimuli tested represented the actual product and not a logo-less manipulation of it. This strategy has been validated in numerous cases.[4]

---

[3] *Amstar Corp. v. Domino's Pizza, Inc.*,615 F.2d 252, 264 (5th Cir. 1980); *see also Citizens Banking Corp. v. Citizens First Bancorp, Inc.*, No. 07-CV-10985, 2007 WL 4239237, at *5 (E.D. Mich. Dec. 3, 2007); *Hutchinson v. Essence Commons, Inc.*, 769 F. Supp. 541, 546 (S.D.N.Y. 1991) ("In evaluating confusion… the only 'relevant population' is potential purchasers of the users goods or services.").

[4] *In-N-Out Burgers v. Doll N Burgers LLC*, No. 20-11911, 2022 U.S. Dist. LEXIS 45305, *31-32 (E.D. Mich. 2022) ("just like Dr. Cunningham's decision to leave [the logo] in [the survey stimuli] is a judgment call based in part on the expert's assessment of underlying disputed facts. This is not grounds for the complete exclusion of an expert report through a motion in limine."

9. The Sowers report's critique is that the Rebel star logo is source-identifying and the reason why the trade dress is perceived as coming from a single source. The Sowers report goes on to cite seven (7) open-end responses that reference the Rebel logo as being recognized. Firstly, the opinion that the logo is source identifying does not disprove that the trade dress is also recognized as coming from a single source. The Sower report provides no evidence that the trade dress alone does not create the perception that the Rebel brand comes from a single source. However, even if the data from these seven respondents who recognize the logo were extracted from those that recognize the Rebel trade dress as coming from a specific source, the resulting data would still indicate that 57.5% of the tested population, a clear majority, believe that the trade dress comes from a single source. Therefore, the Rebel trade dress has achieved relevant secondary meaning even excluding those who cited the Rebel logo as recognizable.

### III. Purported Lack of Control

10. The Sowers report suggests that the secondary meaning portion of the survey conducted for my report did not have a control stimulus and that survey noise was not extracted from the reported secondary meaning results. To the contrary, the survey conducted for my report most certainly did have a control stimuli for both the secondary meaning and the likelihood of confusion questions. The control group were presented the same imagery of the Rebel backpack when asked about secondary meaning issues. The purpose of a control is to "extract survey noise" or those respondents who are guessing or answering nonsensically. By asking the same question based on the same stimuli to two individual groups of 200 respondents, the primary and control segment, we can empirically compare results and determine if there were any relevant differences that might account for survey noise or guessing. It is of relevance to note that the exact same number of primary and control respondents reported that the Rebel trade dress comes from one source. More specifically, among both the primary and control segments of 200 respondents, exactly 122, or 61%, believe that the Rebel back pack's trade dress comes from one source. This effectively proves that there is no survey noise, and that this response is accurate. This process served as an effective control for the secondary meaning segment of the survey conducted for my report.

11. The Sowers report later states that my report's survey results did not subtract survey noise from the primary secondary meaning results to as to achieve net results. It states: *"Had Mr. Wallace performed this calculation (i.e., subtract the 61% of respondents who answered "one company" in the "control" group from the 61% of respondents who answered "one company" in the test group), the net secondary meaning level would be zero (0.0%). Therefore, at best the Wallace Survey demonstrates a net secondary meaning level of zero percent."* This is clearly incorrect. The control using the same image reaffirms

4

the original findings. In this case the awareness of the trade dress coming from one source was exactly the same between both the primary and control groups, thus reconfirming that there is no survey noise to be subtracted from the results.

### V. Purported Confusing Terminology

12. The Sowers report suggests that the term "generic" used in the secondary meaning question in the survey conducted for my report was unclear and biased the reported results. The Sowers report states: *"…just because a respondent believes that a product design is used by more than one company does not necessarily mean that it is generic."* The specific survey question referenced above was: *"From the design of this product, do you believe that this backpack comes from one source/manufacturer or is it a generic design that is used by many different backpack manufacturers?"* This most clearly defines the term "generic" in that the trade dress "is used by many different backpack manufacturers[.]" Importantly, the closed ended responses to this question were:

    *"I believe that this product design comes from one backpack source/manufacturer."*

    *"I believe that this product design is generic and comes from more than one backpack sources/manufacturers."*

    *"Don't know/Can't remember."*

    This clearly defines the difference between the trade dress's association with one versus more than one company. Specifically, the term "generic" is clearly defined as synonymous with coming from more than one source.

13. If the term "generic" was unclear or biased in any way, I fully expect that this issue would be reflected in the open-ended response to question that followed: "Why do you say that?" The 400 open-ended responses to this question do not reference any confusion, misunderstanding, or bias coming from the term "generic." As a result, the Sowers report has no evidence that this term affected the accurate reporting of results.

### VI. Purported Unclear Stimuli Images

14. Regarding the multiple images of the Rebel backpack presented, the Sowers report states in paragraph 47: *"…many respondents did not understand that they were looking at images of the same backpack."* There is no proof of this statement. The Sowers report claims that this statement is based on a non-objective interpretation of five (5) open-ended responses to the follow up question: "Why do you believe that?" (or in this case, why did the

5

respondent state that the trade dress comes from one source). When these open-ended responses are analyzed within this proper context, the following interpretations are much more accurate than Sower's non contextual interpretations. For example, these responses state:

> *"They all looked like they come from the same."* Based on the context of this respondent explaining their belief that the trade dress comes from one source; I can only interpret this to mean that all the pictures of the same backpack look like they come from the same source.

> *"They look too similar to be from different companies."* Based on the context of this respondent explaining their belief that the trade dress comes from one source; I can only interpret this to mean that all the sources of the trade dress elements of the same backpack look too similar to come from multiple sources.

> *"The appearance of the bag and logo seem consistent throughout all the images."* Based on the context of this respondent explaining their belief that the trade dress comes from one source; I can only interpret this to mean that the trade dress of the one backpack shown (*e.g.,* "the appearance of the bag"/not multiple "bags") looks consistent as in it comes from one source.

> *"It looks like it all goes together all of the pictures look the same."* Based on the context of this respondent explaining their belief that the trade dress comes from one source; I interpret this to mean that the all the pictures are of the same product, represent the same trade dress and come from one source.

15. Sowers cannot disprove these interpretations as being more accurate and in context to the question asked. The only response that could possibly be questioned is: *"All of the backpacks have the same logo on the outside."* This comment goes to the issue addressed earlier in this report that the product's trade dress must be presented as it is engaged at the time of purchase, and continued use. Even if the logo is not listed as part of the product's trade dress, extracting the logo would not represent how the actual product is engaged by the consumer.

16. Again, I affirmatively believe that my interpretations above are based on the context of the question asked and are therefore much more accurate than the Sowers report's interpretation taken out of context. However, even if the data from these five (5) responses were excluded, the results would still show that the clear majority of respondents believe that the Rebel trade dress comes from one source and has established relevant secondary meaning.

**VII. Purported Lack of Survey Pre-Testing**

17. In paragraph 49, the Sowers report states: *"To the extent possible prior to administering the final survey, it is important to pretest the proposed series of questions with a small sample of 'the same type of respondents who would be eligible to participate in the full-scale survey.' Such pretests can also help to ensure that all survey questions are understood as intended so they can be rephrased if confusion or other difficulties arise."* (citations omitted).

18. I can affirm that a pilot study was done to pre-test the survey with fifty (50) qualified respondents. The results of the pilot study were provided in the final data tables that were filed with my report, and indicated in chart rows 2-51, or respondent numbers 1 through 106. In reviewing these responses, I found no indication that respondents were not fully understanding of the questions asked. This is why the survey proceeded and was completed as it was originally designed.

**VIII. Purported Lack of Engagement with Product**

19. The Sowers report later states: *"the data on which Mr. Wallace relies do not provide any reliable estimate of consumer perceptions because the presentation of the survey stimulus fails to represent the manner in which consumers would encounter the backpack in the actual marketplace."*

20. Firstly, this contradicts the Sowers reports earlier critique that we did not extract the logo from the stimuli. Again, the logo was not extracted so as to accurately represent the product as consumers engage it in the marketplace. This refutes the critique above.

21. Secondly, the Sowers report suggests that respondents *"were not allowed to zoom in order to see the backpack up close as they are able to do in the actual marketplace."* I agree that there was no zoom feature, but I disagree that a zoom feature was required in order for respondents to fully engage the product experience. The Sowers report stated earlier that the numerous images of the same backpack were confusing, and yet, in this critique it is suggesting that the five (5) images shown do not allow consumers to engage the product so as to properly study it. Outside of the one open ended response that the images "are not very good or clear" there is no evidence to support the claim that respondents could not adequately view the product in forming their opinions. Rather, virtually all the open-ended responses indicate that consumers adequately engaged with these images in that they provided numerous ways for respondents to inspect the product from every angle and inside the bag.

**IX. Purported Lack of Representative Sample**

7

22. In paragraphs 56 – 61, the Sowers report states that the pool of respondents selected for the survey conducted for my report does not represent the relevant consuming public. He states: *"I see no evidence in the Wallace Survey indicating that any measures were taken to ensure a representative sample… with respect to age, gender, or any other demographics."* He fails to mention that age, gender, geographic area, income, and other demographic data were supplied in the data files submitted with my report. This data indicates that we have appropriate samples from each relevant segment of the population based on the above dynamics.

23. The Sowers report critiques the survey sampling process because it did not use "click-balancing[.]" This is correct. In my extensive expertise as a marketing consultant, I have learned that click balancing is used for much larger surveys seeking respondents across the entire population regarding issues addressed by a large majority of the population (*i.e.,* political issues, health care issues *etc.*). The survey conducted for my report was focused exclusively on a very small segment of the population comprising cheerleading backpack consumers. In my forty plus year career as a brand strategist and twenty plus year career as an expert witness, I have never used click balancing for target audience of this size, nor, based on the demographics it engaged would I expect a click balanced survey results to be any different than the results indicated in my report.

## X.  Summary of Critiques

24. The Sowers report states: *"the survey population was not properly defined or screened for qualification."* Again, the screener used by the survey conducted for my report qualified that all respondents had purchased cheerleading backpacks within the last twelve (12) months and planned to do so again in the next twelve (12) months - confirming that they are both pre-existing purchasers *and* potential purchasers. It qualified that respondents were from a range of ages and geographic locations. It qualified that respondents could properly see the stimuli. It qualified that all respondents would answer accurately without insights from outside resources. And, in short, it met all the other screening criteria used in the seventy five (75) plus court compliant surveys I have conducted as an expert and the hundreds I have conducted as a marketing consultant. The Sowers report provides no explanation of this claim nor any evidence to support that my survey population does not meet court-compliant standards.

25. The Sowers report states: *"the survey failed to remove indicia of origin from secondary meaning stimuli[.]"* As addressed earlier, proper stimuli must represent the product as it is engaged by the consumer. If we removed the Rebel star logo, it would have misrepresented the product as it is engaged at the point of sale and in daily use.

8

26. The Sowers report states: *"the secondary meaning section of the survey does not include a control."* As mentioned, the control stimuli used, although the same as the primary stimuli, extracted all survey noise, in that the results between the primary set of 200 respondents and the control set of 200 respondents were identical, not just similar or highly similar, but statistically identical. This is proof of a truthful extraction of all survey noise, and as such, the purpose of a control was met, and the reported results are accurate.

27. The Sowers report states: *"the questions to test secondary meaning are flawed"* because the term "generic" was used. As mentioned, this term accurately describes a trade dress that is not from one source but used by more than one source. This was clearly communicated in both the question asked and the open-ended response provided. The Sowers report provides no evidence the term generic was misunderstood as anything beyond its universally accepted definition. Again, the open-ended responses further confirm this.

28. Sowers states: *"the survey relies on flawed presentation of stimuli."* Firstly, the Sowers report claims that the numerous images were not perceived to come from the same product. He fails to mention that the question that precluded the stimuli indicated: "In shopping for cheerleading backpacks you first come across **this product**" (emphasis added). The question clearly identifies these images as all coming from one product and not multiple products (*e.g.*, "these products"). In addition, virtually all open-ended responses confirmed that respondents understood that the stimuli was from one product. Secondly, the Sowers report claims that since the images could not be zoomed-in on, they did not allow respondents to fully analyze the trade dress. As mentioned earlier, there was only one (1) of 400 open ended responses that indicated that the images were not clearly understood.

29. Lastly, the Sowers report states: *"the sampling frame was not designed to represent the target population[.]"* Again, the Sowers report fails to reference the demographic data that was filed with my report. Further, a reliance on click balancing would only be appropriate if we were surveying the great majority of the entire population. My screening criteria specifically focused respondent selection on the small, relevant universe of recent cheerleading backpack purchasers and potential purchasers.

XII. **Conclusion: No Evidence of Survey Flaws**

30. It is most important to note that the Sowers report did not validate any of its critiques with any relevant evidence or data. The Sowers report was not substantiated with any valid survey or facts. The great majority of the open-ended responses that the Sowers report cited to support its critiques were either misinterpreted or misinformed. Even if the data from these cited open-ended responses were excluded from the overall data pool, the overall results would not change. In short, even if its critiques were valid, which they are

9

not, the Sowers report provides no empirical proof that the Rebel trade dress has not achieved relevant secondary meaning and that the Defendant's product does not infringe on the Rebel brand's trade dress. The Sowers report critiques do not change the substantiated opinions expressed in my report.

31. I hold these opinions within a reasonable degree of certainty based on the survey results and my forty-plus year experience in the branding industry. I respectfully reserve the right to amend this declaration with further comments in the event that additional information becomes available.

32. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on January 25, 2024.

_____
Rob Wallace