## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

REBEL ATHLETIC INC.,

Case No. 1:22-CV-3330

v.

Judge John Robert Blakey

JIM LUNDBERG D/B/A CS ATHLETIC
D/B/A CHEERSTIX

## MEMORANDUM OPINION AND ORDER

Plaintiff Rebel Athletic Inc. ("Rebel") sued Defendant Jim Lundberg d/b/a CS Athletic d/b/a CheerStix ("Lundberg") for federal trademark infringement. [40]. Defendant moved for summary judgment, [144], and Plaintiff cross moved, [173]. Both parties also filed motions concerning the record: Defendant moved to exclude the expert testimony of Rob Wallace, [159]; Plaintiff moved to exclude the expert testimony of Hrag Nassanian, [171]; and Defendant moved to strike the errata sheet for the Rule 30(b)(6) deposition of Plaintiff and related declarations. For the reasons explained below, the Court denies the motions to exclude, [159], [171], denies Defendant's motion to strike, [155], grants Defendant's motion for summary judgment, [144], and denies Plaintiff's motion for summary judgment [173].

### I. Background

Rebel, a cheerleading apparel brand based in Texas, sells, among other products, a backpack called the "Rebel Dream Bag." [40] ¶¶ 6,7; *see* [178] ¶ 7. Under Trademark Registration No. 6,592,712 ("'712 Registration" or "'712 Trademark"),

1

Plaintiff holds a trademark in the Dream Bag's "two-dimensional hourglass shaped enclosed curved figure double outline design, with an outlined straight rectangular shaped top line and an outlined curved three-fourth rectangular shaped line underneath, both inside the curved figure outline design," as pictured. [178] ¶ 92.



*Id.*

Additionally, Rebel asserts a common law trademark in the Dream Bag's trade dress, the "overall image and appearance of Plaintiff's bag" including but not limited to "color shape, size, texture, and graphics." *Id.* ¶ 1. Specifically, Rebel includes the following elements in the bag's trade dress: the space at the front of the bag for team logos, the front-loading nature of the bag, the "feminine hourglass shape visually appearing in a contrasting color," its "unique" shoe compartment and its placement, the "contrasting color zipper pocket outlines," distinctive placement and style of the pockets, glitter fabric, interior fabric monogramming pattern, and its hairbow clip. *Id.*

Jim Lundberg, under the business name CheerStix, operates an interactive internet store which sells cheerleading apparel, including cheerleading backpacks. [40] ¶ 13. In August 2021, Lundberg engaged designer Fernando Robert to develop a cheerleading backpack. [192] ¶ 1. Lundberg sent Robert examples of his desired design, including images of the Rebel Dream Bag and Nfinity Bag. [153-6] at 5.

Lundberg said he wanted his "own version" of a bag, though Robert noted that his mock-up possessed many similarities to the Rebel bag. [192] ¶ 4, 8, 12. Defendant's resulting bag, the "It Bag" or "CS Athletic Bag," entered the market in January 2022. [205] ¶ 8.

On June 26, 2022, Rebel sued Lundberg. [1]. Rebel's Amended Complaint specifically alleges: (1) trademark infringement under 15 U.S.C. § 1114(1)(a) as to the '712 trademark (Count I); (2) false designation of origin under 15 U.S.C. § 1125(a) as to the unregistered trade dress (Count II); and (3) violation of the Illinois Uniform Deceptive Trade Practices Act, 815 ILCS § 510, as to the unregistered trade dress (Count III). [40].[1] Following discovery, Defendant moved for summary judgment, [144], to strike, [155], and to exclude Plaintiff's expert, Rob Wallace, [159]. Plaintiff filed a cross motion for summary judgment, [173], and its own motion to exclude Defendant's expert Hrag Nassanian, [171]. The Court addresses each motion below.

## II.    Motions to Exclude [159], [171]

Defendant moves to exclude the expert report of Rob Wallace, who opines, based upon survey evidence, that the Dream Bag has acquired secondary meaning. [159]. Plaintiff separately moves to exclude the expert report of Hrag Nassanian, who opines upon the functionality of the Dream Bag's trade dress. [171].

Federal Rule of Evidence 702 and the Supreme Court's holding in *Daubert v. Merrell Pharmaceuticals, Inc.*, 509 U.S. 579 (1993), "govern the admissibility of

---

[1] The Court previously denied as moot Plaintiff's opposed motion to file a Third Amended Complaint ("TAC"). [74]; [85]; [164]. Accordingly, the operative complaint remains the second amended complaint, [40]. The Court addresses Plaintiff's opposed request to nonetheless file a TAC, [168], *infra*.

expert testimony." *Kirk v. Clark Equip. Co.*, 991 F.3d 865, 871 (7th Cir. 2021) (citing *Haley v. Kolbe & Kolbe Millwork Co.*, 863 F.3d 600, 611 (7th Cir. 2017)).  Rule 702 provides that a person may testify as an expert if: (1) the testimony will "help the trier of fact to understand the evidence or to determine a fact in issue"; (2) the testimony is "based on sufficient facts or data"; (3) the testimony is "the product of reliable principles and methods"; and (4) the expert has "reliably applied the principles and methods to the facts of the case."  Fed. R. Evid. 702.[2]

Under *Daubert*, the district courts serve a gatekeeping function to prevent the admission of irrelevant or unreliable testimony.  *See Daubert*, 509 U.S. at 597; *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 809 (7th Cir. 2012).  To perform this role, "the district court must engage in a three-step analysis, evaluating: '(1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony.'" *Kirk*, 991 F.3d at 872 (quoting *Gopalratnam v. Hewlett-Packard Co.*, 877 F.3d 771, 779 (7th Cir. 2017)).  Rule 702's "standard for relevance also incorporates this Court's obligations under Rule 403 to 'determine the total effects of proposed evidence, weighing its probative value against its potential to (among other things) confuse the jury.'" *United States v. Burke*, No. 19 CR 322, 2023 WL 7221897, at *4 (N.D. Ill. Nov. 2, 2023) (quoting *United States v. Schiro*, 679 F.3d 521, 529 (7th Cir. 2012)).

---

[2] The *Daubert* analysis applies to nonscientific expert testimony in equal force; district courts may apply *Daubert* flexibly as "*Daubert*'s list of specific factors neither necessarily nor exclusively applies to all experts or in every case."  *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 141 (1999).

The proponent of the expert testimony bears the burden of establishing its admissibility by a preponderance of the evidence. *See Lewis v. CITGO Petroleum Corp.*, 561 F.3d 698, 705 (7th Cir. 2009). So long as the proponent establishes a threshold level of reliability and relevance, then the testimony is admissible under Rule 702. *Daubert*, 509 U.S. at 596. The district court maintains "the same broad latitude when it decides how to determine reliability as it enjoys in respect to its ultimate reliability determination." *Id.*

A court views an expert's requirements for qualification with a "liberal standard; the expert need only have some 'specialized knowledge that would assist the trier of fact.'" *Africano v. Atrium Medical Corporation*, 561 F. Supp. 3d 772, 776 (N.D. Ill. 2021) (quoting *Prayitno v. Nextep Funding LLC*, No. 17-cv-4310, 2019 WL 6497374, at *3 (N.D. Ill. Dec. 3, 2019)). Courts may properly "consider a proposed expert's full range of practical experience as well as academic or technical training when determining whether that expert is qualified to render an opinion in a given area." *Smith v. Ford Motor Co.*, 215 F.3d 713, 718 (7th Cir. 2000). An expert need not possess "specific academic credentials. Rather, 'anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness.'" *Lujano v. Town of Cicero*, No. 07-cv-4822, 2011 WL 6097719, at *2 (N.D. Ill. Dec. 6, 2011) (quoting *Tuf Racing Prods., Inc. v. American Suzuki Motor Corp.*, 223 F.3d 585, 591 (7th Cir. 2000)); *see also Tuf Racing*, 223 F.3d at 591 ("The notion that *Daubert* requires particular credentials for an expert witness is radically unsound.").

Courts must focus the inquiry not on "whether an expert witness is qualified in general, but whether his qualifications provide a foundation for" the witness "to answer a specific question." *Myers v. Illinois Central R. Co.*, 629 F.3d 639, 644 (7th Cir. 2010) (quoting *Gayton v. McCoy*, 593 F.3d 610, 617 (7th Cir. 2010)) (alternation in original). Specifically, a court should compare "the area in which the witness has superior knowledge, skill, experience, or education with the subject matter of the witness's testimony" to evaluate the qualifications of the expert. *Gayton*, 593 F.3d at 616 (quoting *Carroll v. Otis Elevator Co.*, 896 F.2d 210, 212 (7th Cir. 1990)).

Under Seventh Circuit precedent, the test for reliability for nonscientific expert opinions remains flexible. *United States v. Romero*, 189 F.3d 576, 584 (7th Cir. 1999). An "expert's opinion 'must be reasoned and founded on data'" and "must also utilize the methods of the relevant discipline." *Manpower, Inc. v. Insurance Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013) (quoting *Bielskis v. Louisville Ladder, Inc.*, 663 F.3d 887, 894 (7th Cir. 2011)). When evaluating the reliability of expert testimony under Rule 702, the analysis "primarily" concerns "the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced." *Manpower, Inc. v. Insurance Co. of Penn.*, 732 F.3d 796, 806 (7th Cir. 2013). Determinations on admissibility "should not supplant the adversarial process" and "shaky expert testimony" may still be admissible—and subject to rigorous cross-examination by opponents. *Gayton v. McCoy*, 593 F.3d 610, 616 (7th Cir. 2010).

6

### a. Plaintiff's Expert Rob Wallace

Plaintiff retained Rob Wallace to testify regarding whether the Rebel Dream Bag's trade dress has acquired secondary meaning among the consuming public. [152-7] at 2. Wallace has extensive experience in brand identity strategy and design, with over thirty years as Managing Partner of Wallace Church & Co.; and he has served as Managing Partner of Best of Breed Branding Consortium. [152-7] at 3. Additionally, Wallace has been involved with over one thousand consumer surveys and research projects. *Id.* at 4; *see also id.* at 26–34. Wallace based his expert opinion upon a consumer survey he conducted between September 27 and October 5, 2023. *Id.* at 2, 7.

Wallace's survey included a population of respondents who purchased cheerleading backpacks within the last twelve months and planned to do so again in the next twelve months. *Id.* at 9. The survey split respondents into two groups of 200 respondents, a primary and a control segment. [152-7] at 8. Both groups viewed the same images (the Rebel Dream Bag, Lundberg's It Bag, and a control backpack) and answered the same questions. *Id.* at 13–14, 16–17, 20–21; [159-1] at 4. Images of the Rebel Dream Bag included the company's "R" star logo, which Plaintiff does not assert as part of the purported trade dress. [159] at 12–13. The Wallace Survey asked both close-ended and open-ended questions. *E.g.*, [157-2] at 13– 15.[3]

Defendant argues that the Court should exclude Wallace's expert testimony and expert report based upon the survey's use of an unreliable methodology. [159].

---

[3] For instance, one question asked, "From the design of this product, do you believe that this backpack comes from one source/manufacturer or is it a generic design that is used by many different backpack

Defendant's own expert, Brian M. Sowers, opines that Wallace's survey remains fundamentally flawed in design and highly susceptible to misinterpretation, and he claims that no valid or reliable conclusions can be drawn from the data. *Id*. at 2–3. Sowers specifically points to issues that "the survey population was not properly defined or screened for qualification;" "the survey failed to remove indicia of origin from secondary meaning stimuli;" "the secondary meaning section of the survey does not include a control;" "the questions to test secondary meaning are flawed;" "the survey relies on flawed presentation of stimuli;" and "the sampling frame was not designed to represent the target population." *Id*. Defendant does not challenge Wallace's qualifications nor the relevance of his testimony.

Wallace's qualifications as an expert clearly meet the *Daubert* threshold. Wallace has over thirty years of experience in marketing and branding, and extensive work on similar consumer surveys. [152-7] at 2–3, 26–34. Additionally, Wallace's expert report and testimony constitute relevant evidence as it directly helps the trier of fact determine the likelihood of confusion issue. The only dispute here remains the methodology of Wallace's consumer survey and analysis. [159].

A consumer survey "must comply with the principles of professional survey research," *Evory v. RJM Acquisitions Funding LLC*, 505 F.3d 769, 776 (7th Cir. 2007), and should not rely upon "leading or suggestive" questions, *Muha v. Encore*

---

manufacturers?" [152-7] at 14. The respondent chose one of three close-ended responses: "I believe that this product design comes from one backpack source/manufacturer," "I believe that this product design is generic and comes from more than one backpack sources/manufacturers," or "Don't know/Can't remember." *Id*. Sixty-one percent of the 200 individuals in the test group, and sixty-one percent of the 200 individuals in the control group answered that the backpacks depicted in the images—the Rebel Dream Bag and Defendant's bag—came from the same company. *Id*. The subsequent question asked an open-ended question, "Why do you say that?" *Id*. at 15.

*Receivable Mgmt., Inc.*, 558 F.3d 623, 625–26 (7th Cir. 2009) (quoting *American Home Products Corp. v. Johnson & Johnson*, 654 F. Supp. 568, 590 (S.D.N.Y. 1987)). A reliable survey must "replicate market conditions" and remain free of bias. *Spraying Sys. Co. v. Delavan, Inc.*, 975 F.2d 387, 394, 396 (7th Cir. 1992).

The Seventh Circuit has noted that "while there will be occasions when the proffered survey is so flawed as to be completely unhelpful to the trier of fact and therefore inadmissible, such situations will be rare." *AHP Subsidiary Holding Co. v. Stuart Hale Co.*, 1 F.3d 611, 618 (7th Cir. 1993) (citing *Spraying Sys.*, 975 F.2d at 394) (citation omitted). Often courts find that "shortcomings in the survey results go to the proper weight of the survey" rather than admissibility, "and should be evaluated by the trier of fact." *See e.g.*, *id.*; *Uncommon, LLC v. Spigen, Inc.*, 305 F. Supp. 3d 825, 850 (N.D. Ill. 2018) (stating that courts "rarely exclude consumer surveys from evidence since most 'shortcomings' go to 'the proper weight of the survey' rather than admissibility'" (quoting *AHP Subsidiary*, 1 F.3d at 618)), *aff'd*, 926 F.3d 409 (7th Cir. 2019); *Uncommon, LLC v. Spigen*, 926 F.3d 409, 417 (noting that no survey is "foolproof").

District courts in the Northern District of Illinois have supplemented these general principles with a wide array of factors drawn from cases cited with approval by the Seventh Circuit, including, but not limited to the following: "whether (1) the 'universe' was properly defined, and a representative sample of that universe was selected, (2) the questions to be asked of interviewees were framed in a clear, precise, and nonleading manner, and (3) the objectivity of the entire process was ensured."

*Dyson, Inc. v. Bissell Homecare, Inc.*, 951 F.Supp.2d 1009, 1017 (N.D. Ill. 2013) (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir. 1999)). Courts note that "although these criteria generally address the weight a fact finder should give the survey, a survey method that ignores these criteria may be of so little utility as to be rendered irrelevant—and thus inadmissible." *LG Electronics U.S.A., Inc., v. Whirlpool Corp.*, 661 F. Supp.2d 940, 952 (N.D. Ill. 2009) (collecting cases).

Here, Defendant contends that the Wallace Survey employed flawed methodology because the survey consisted of a flawed universe, flawed questions, an insufficient control group, flawed presentation of stimuli, and failure to remove indicia of origin from stimuli.

### 1. Universe

The selected universe of respondents significantly affects the probative value of a consumer survey. *See Spraying Sys.*, 975 F.2d at 394 n.5 (7th Cir. 1992). For trademark cases, "the proper universe usually is potential purchasers of the junior users' products or services." *Bobak Sausage Co. v. A & J Seven Bridges, Inc.*, No. 07 C 4718, 2010 WL 1687883, at *6 (N.D. Ill. Apr. 26, 2010). An "erroneous or undefined" universe diminishes the survey's reliability. *Competitive Edge, Inc. v. Staples, Inc.*, 763 F.Supp.2d 997, 1008 (N.D. Ill. 2010) (citing *Spraying Sys.*, 975 F.2d at 394 n.5). After creating a defined universe, "a reliable survey must select a sample population that accurately represents the universe." *Id.* The universe and sample "need not be perfect to be admissible" under Rule 702, and often any "criticisms concerning the sampling universe used in" "secondary meaning surveys go to the weight, but not the

10

admissibility of" the expert. *See, e.g.*, *Black & Decker Corp. v. Positec USA Inc.*, No. 11-cv-5426, 2015 WL 5612340, at *18 (N.D. Ill. Sept. 22, 2015).

An underinclusive survey may nonetheless be admissible. For example, a survey with a universe that "could be better defined" since it was "underinclusive because it would miss potential purchasers" and overinclusive because it did not ask whether respondents "are currently in the market for Defendant's products" still was "not so flawed as to be completely unhelpful to the trier of fact." *Black & Decker*, 2015 WL 5612340, at *18. In contrast, an underinclusive survey population "limited the surveys' probative value" when it excludes substantial portions or subsets of the most likely consumers. *See Spraying Sys. Co.*, 975 F.2d at 394 n.5 (excluding survey when universe only included farmers, despite distributors and equipment manufacturers constituting a "sizable portion" of the consumers at issue). When survey populations are, in relevant part, overinclusive, the Court has suggested questions to narrow the scope of potential customers: (1) "Have you sought to purchase banquet or conference facility services in the last twelve months?" and (2) "Do you plan to purchase banquet or conference facility services in the next twelve months?" *Bobak Sausage Co.*, 2010 WL 1687883, at *6.

Here, Lundberg argues that the survey consists of an underinclusive universe, as it excludes those consumers who have not purchased cheerleading equipment in the last 12 months but plan to do so in the next 12 months. [159] at 7. The Wallace survey report identifies its universe as men and women living in the United States between the ages of 18 to 65, "who have purchased or been involved in the purchase

11

of cheerleading equipment, including back packs in the last 12 months, and plan to do so again in the next 12 months." [152-7] at 9. Thus, the universe ensures the population consists only of the most likely purchasers of Defendant's backpack, or "potential purchasers of the junior users' products or services," even if some consumers exist outside this universe. *See Bobak Sausage Co.,* 2010 WL 16878832010 WL 1687883, at *6. By asking whether potential customers have (1) purchased the product in the past 12 months, and (2) plan to do so again in the next 12 months, the Wallace Survey also narrowed the scope of its potential customers consistent with *Bobak Sausage Co. Id.* Lundberg has not shown that excluded consumers from the survey universe represent a "sizeable portion" of the market, the flaw that warranted the survey's exclusion in *Spraying Sys.*

Consequently, Lundberg's criticisms related to the sampling universe go to the weight of the evidence, not the survey's admissibility. *See Black & Decker Corp.*, 2015 WL 5612340, at *18 (noting "'while there are significant flaws in the methodology of this survey'—including selecting an 'overinclusive' universe of respondents and using close-ended and leading questions—'they go to the weight and not the admissibility of the survey'") (quoting *Univ. of Kan. v. Sinks*, 565 F.Supp.2d 1216, 1232 (D. Kan. 2008)).

This Court declines to address the argument that the Wallace Report was not screened for qualification as Defendant's failure to cite any supporting case law results in waiver of the argument. *LINC Fin. Corp. v. Onwuteaka*, 129 F.3d 917, 922

(7th Cir. 1997) (stating that "failure to produce a single case" to support a non-jurisdictional argument is sufficient to waive that argument).

> 2. *Questions: Whether Survey Questions Were Clear, Precise, and Nonleading*

A survey should have clear, precise, and nonleading questions. *Dyson, Inc.*, 951 F. Supp. 2d at 1017 (quoting *Schering Corp. v. Pfizer Inc.*, 189 F.3d 218, 225 (2d Cir. 1999)). Further, "a reliable survey should avoid the use of confusing or ambiguous questions." *Competitive Edge, Inc.*, 763 F. Supp. 2d at 1008. A proper survey avoids respondents "guessing as to the 'right' answer" by utilizing "filter questions and 'don't know' or 'no opinion' answer alternatives." *Id.* at 1009. Importantly, the issue of whether questions "adequately focus on the correct issue goes to how much weight the Court should give the survey results," not its admissibility. *Chartwell Studio, Inc. v. Team Impressions, Inc.*, No. 19-CV-06944, 2023 WL 1992180, at *6 (N.D. Ill. Feb. 14, 2023) (citing *McGraw-Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1172 (7th Cir. 1986)). Likewise, whether a particular survey question "could have resulted in sampling bias" also goes to weight, not the survey's admissibility. *See Bodum USA, Inc. v. A Top New Casting, Inc.*, No. 16 C 2916, 2017 WL 6626018, at *7 (N.D. Ill. Dec. 28, 2017).

Questions that render a survey essentially useless to the trier of fact warrant exclusion, *e.g.*, *Sears, Roebuck & Co. v. Menard, Inc.*, No. 01-cv-9843, 2003 WL 168642, at *3 (N.D. Ill. Jan. 24, 2003) (excluding survey that "contained a highly leading question; and it failed to ask respondents a crucial state-of-mind question

regarding perceived association"), but courts typically admit surveys with lesser flaws. *See, e.g.*, *Bobak Sausage Co*, 2010 WL 1687883, at *6–8; *Chartwell Studio, Inc.*, 2023 WL 1992180, at *6. For example, the court held that a survey using leading questions skewed to obtain a desire result was not one of the "rare" surveys that was "so flawed as to be completely unhelpful to the trier of fact." *Bobak Sausage Co.*, 2010 WL 1687883, at *6–8 (quoting *AHP Subsidiary Holding Co.*, 1 F.3d at 618).

Here, Defendant contends that the following question was flawed: "From the design of this product, do you believe that this backpack comes from one source/ manufacturer or is it a generic design that is used by many different backpack manufacturers?" [159] at 9 (citing [152-8]) (alteration in original); [183] at 8. Defendant argues that the use of the term "generic" caused respondents to improperly consider the generic nature of the bags, as opposed to considering whether they associated the backpack with one source, more than one source, or no source at all. [159] at 9. A critique of whether the survey question focuses on the correct issue does not affect admissibility, but rather, "goes to how much weight the Court should give the survey results." *Chartwell Studio, Inc.*, 2023 WL 1992180, at *6. Accordingly, Lundberg's argument regarding this survey question goes to the survey's weight, not admissibility.

Defendant additionally argues that the lack of a survey pre-test warrants exclusion. On the contrary, pre-tests "are not required" and do not justify the exclusion of that expert's testimony. *Zarinebaf v. Champion Petfoods USA Inc.*, No.

18 C 6951, 2022 WL 910638, at *3 (N.D. Ill. Mar. 29, 2022). Therefore, the Wallace Survey's lack of a pre-test does not render the survey inadmissible.

### 3. Other Concerns

Defendant's other concerns regarding the Wallace Survey's methodology—that it: (1) employed a faulty control group, (2) improperly failed to remove the Rebel backpack's indicia of origin, and (3) relied on flawed presentation of stimuli—go to the weight of the evidence, and do not warrant exclusion at the *Daubert* stage.

Trademark surveys are designed to "measure how the trademark influences participants' 'perceptions or understanding of a product.'" *Bobak Sausage Co.*, 2010 WL 1687883, at *7 (quoting Shari Seidman Diamond, Reference Guide on Survey Research, *in* Federal Judicial Center, Reference Manual on Scientific Evidence 256 (2d ed. 2000)). Hence, a control group brings "preconceptions to light" and ascertains "the baseline knowledge" of participants. *Id.* Ideally, surveys "use a control group or control question." *Zarinebaf*, 2022 WL 910638, at *4 (citing *id.*). A proper control group should share as many characteristics with the experimental stimulus as possible, with the "key exception of the characteristic whose influence is being assessed." *LG Electronics U.S.A., Inc.*, 661 F. Supp.2d at 955. An imperfect control group remains better than no control group, but the "choice of the specific control group" "should influence the weight that the survey receives." *Id.*

Courts may admit surveys even without a control group. In *Black & Decker Corp.*, the court determined that the survey's complete lack of a control group was "not so obviously fatal as to render" the expert's "testimony inadmissible," because

the survey did contain "'further probing into the basis for the respondents' belief as to who makes the pictured or described product." 2015 WL 5612340, at *20 (citing *Nat'l Football League Properties, Inc. v. ProStyle, Inc.*, 57 F. Supp. 2d 665, 668 (E.D. Wis. 1999)). Likewise, in *Bobak Sausage Co.*, the court determined that the lack of a sufficient control group was not so "rare" as to render it completely unhelpful to the trier of fact. 2010 WL 1687883, at *7–8.

Here, Defendant argues that the Wallace Survey warrants exclusion, in part, because it lacks a sufficient control group. [159] at 10. Here, Wallace split the survey population sample into two groups, one "test" group and one "control" group, where respondents in both groups viewed identical images and answered the same questions. *Id.* at 11. Since both groups viewed the same images of the Rebel Dream Bag, however, it follows that the "characteristic whose influence is being assessed"— the trade dress at issue—existed in both groups. *LG Electronics U.S.A., Inc.,* 661 F. Supp.2d at 955. Therefore, the Wallace Survey's "control group" failed to determine whether the consumer confusion stems from the trade dress at issue or from unrelated elements of the backpack.

The same situation occurred in *Black & Decker*, however, where the court determined that probing follow-up questions sufficiently replaced the need for a control group at the admissibility stage, since they determined the source of any customer confusion. 2015 WL 5612340, at *20. The Wallace survey likewise followed its closed-ended question regarding source with an open-ended question—"Why do you say that?", [152-7] at 15, 19, 20, thus further probing into the responses.

16

Accordingly, just as the probing questions made up for the insufficient control group in *Black & Decker*, the Court finds that the follow-up question mitigates the survey's flawed control group. Further, because courts have admitted surveys with no control group at all, criticisms of the Wallace survey's control group here go to its weight, not admissibility.

Likewise, the failure to remove Rebel's star-shaped "R" design logo goes to the weight of the survey, not admissibility. Since the images of the Rebel Dream Bag presented to Wallace Survey respondents included this indicium of origin, Lundberg argues the Wallace Survey "simply measures how many respondents recognize the backpack as coming from one company because it contains a brand logo on it." [159] at 12–13. Defendant supports his position by relying on *Competitive Edge, Inc.*, where both the senior and junior users' products displayed the same non-trade-dress, source-indicative element (the color purple), which posed the risk of influencing respondents to conclude that all purple calculators derived from the same source. 763 F.Supp.2d at 1010.

The presence of source-identifying indicia, however, does not necessarily make a survey inadmissible. For example, *In-and-Out Burger v. Doll N Burgers LLC*, No. 20-11911, 2022 WL 791924, at *7 (E.D. Mich. Mar. 14, 2022), concluded that the expert's judgment call to keep potentially source-identifying indicia, elements not part of the relevant dispute, "clearly does not evince a significant methodological error" since "courts in the past have still relied on secondary meaning surveys even though they might have contained such extra indicia." *Id.* (citing *Hershey Foods*

17

*Corp. v. Mars, Inc.*, 998 F. Supp. 500, 515 (M.D. Pa. 1998)). Similarly, the Middle District of Pennsylvania relied on a secondary meaning survey despite the defendant's argument that "additional elements" not part of the alleged trade dress "gave the survey respondents additional clues for the source of the dress." *Hershey Foods Corp. v. Mars, Inc.*, 998 F. Supp. 500, 515 (M.D. Pa. 1998).

Here, the star "R" logo appeared only on Rebel's backpack, not on Lundberg's. *See* [152-7] at 13, 16. As a result, there exists little risk of respondents mistaking the Rebel and Lundberg backpacks as deriving from the same source on the basis of the logo. Moreover, Defendant's reliance on *Competitive Edge, Inc.* remains misplaced; that survey contained other serious flaws that led to its exclusion. *Competitive Edge, Inc.*, 763 F. Supp. at 1010. Rather, Rebel's "judgement call" to leave the star "R" logo on its backpacks remains no more harmful than the source-identifying indicium in the *In-and-Out Burger* survey or the *Hershey Foods Corp.* survey. Accordingly, the presence of the star "R" logo on the Rebel Dream Bag does not render the survey inadmissible.

Nor does the Wallace Survey's potential reliance on flawed presentation of stimuli render it inadmissible. Defendant specifically argues that certain flaws— respondents could not zoom in on images of the backpacks and did not confirm that they could view the images clearly—render the survey essentially worthless. [159] at 13–14. But the "manner of presentation to the interviewee goes to the weight to be accorded to the survey results rather than providing a reason to ignore the survey

evidence altogether." *McGraw–Edison Co. v. Walt Disney Prods.*, 787 F.2d 1163, 1172 (7th Cir. 1986).

In summary, for the reasons described above, the Court finds the Wallace survey admissible and thus denies Defendant's *Daubert* motion.

### b. Defendant's Expert Hrag Nassanian

Defendant submits the expert report by Hrag Nassanian in which Nassanian opines upon the functionality of the Rebel Dream Bag. Rebel seeks to exclude Nassanian's initial expert report and his rebuttal report, arguing that Nassanian fails to qualify as an expert and that his methodology lacks reliability. [171]. The Court disagrees on both grounds and thus denies Rebel's motion.

As noted in his expert report and resume, Nassanian has extensive experience in bag design. [171-1] at 1–2, 25. Nassanian worked for over 20 years as a product designer and developer of bags, including backpacks, duffel bags, gym sacks, shoulder bags, luggage, roller bags, totes, and messenger bags. [171-1] at 2, 26. Relevant here, Nassanian built the product line of basketball bags at Nike and led the company's global bag product design and development for several kinds of athletic bags. [171-1] at 1–2. Nassanian previously taught a college course on principles of bag design and currently consults on product design and development. [171-1] at 25–26.

In his report, Nassanian opines upon the functionality of the Rebel Dream Bag design, evaluating the functionality of the bag's individual components and the overall bag in the context of its use generally and its unique role in cheerleading. *See, e.g.*, [171-1] at 12. Nassanian concludes that Rebel Dream Bag's trade dress overall

19

remains functional, as do the following components on the bag: contrasting color zipper pocket outlines; front pocket style and placement; side mesh and placement; auxiliary side pocket style and placement; glitter fabric; interior-fabric monogramming patterns; shoe compartment style and placement; and clip placement. [171-1] at 2–3.

Rebel argues that Nassanian's lack of knowledge regarding cheerleading renders him ineligible to opine on the Dream Bag, designed for cheerleaders. While Nassanian's report touches upon the bag's use in cheerleading, his opinion also encompasses manufacturing details, design choices common to bags generally, and non-cheerleading-specific use of the bag.[4] These opinions derive from Nassanian's uncontested expertise in bag product design and development, which does not require specific cheerleading knowledge or expertise. Additionally, while Nassanian did not have specific work with cheerleaders or cheerleading bags prior to this lawsuit,

---

[4] *E.g.*, [171-1] at 5 ("Nylon / Polyester zippers offer a wide range of color achievability, finishes, and effects, often more so than other backpack components."); *id.* at 7 ("The zipper tape is typically crafted of nylon or polyester. The zipper coil or the spiral plastic elements are also composed of nylon or polyester. Sometimes, the zipper may have molded teeth typically composed of polyacetal resin. The inherent nature of these synthetic materials is their ability to achieve the most comprehensive and saturated range of colors and finishes possible, including but not limited to neons, brights, and metallic hues."); *id.* ("Typical of many backpacks used for lifestyle and sport, the Rebel Dream Backpack is somewhat unstructured, which allows the overall shape to be more rounded and less defined to the specific way the backpack is patterned."); *id.* at 9 ("The front pocket of the Rebel Dream Bag has a radius of about 3 cm at each of the four corners of its front panel. A generous radius is needed at the top left and top right corners where the zipper is sewn into the seam so the zipper can open smoothly." "In addition, during mass production, when the front pattern piece of the pocket is sewn to the side gusset and zipper pattern piece, a radius is needed on all four corners so the sewing machine operator stitching the pattern pieces together can stitch the pieces together in one continuous operation. Otherwise, if the corners were sharp without a radius, the sewing machine operator would need to stop at each corner and readjust the pattern pieces before proceeding. Sewing a panel this way would increase the sewing and labor time dramatically, increasing the overall cost of the bag and making it an impractical solution."); *id.* at 10 ("In a scenario where a stuck-on pocket such as the one on the Rebel Dream Bag is placed toward the middle or top of the front panel, the weight from the contents of this stuck-on pocket and the unstructured nature of the overall bag will allow the stuck-on pocket to cave-in or collapse the overall shape and volume of the bag.").

Nassanian's expertise includes knowledge about the way athletes interact with bags. *See* [171-1] at 1–2. In a general sense, a cheerleader's experience and needs with a bag parallels the needs of a basketball player or other athlete—knowledge clearly within Nassanian's range of expertise.

To the extent Rebel challenges Nassanian's qualifications within the cheerleading context or knowledge of aspects unique to cheerleading, that critique goes to the weight of Nassanian's opinion, not the admissibility of the opinion itself. *See Hall v. Flannery*, 840 F.3d 922, 929 (7th Cir. 2016) ("The fact that an expert may not be a specialist in the field that concerns her opinion typically goes to the weight to be placed on that opinion, not its admissibility."); *see also Noffsinger v. Valspar Corporation*, No. 09-cv-916, 2013 WL 12340487, at *3 (N.D. Ill. Jan. 4, 2013) (holding that, even once the court finds an expert's qualifications suffice under *Daubert* and Rule 702, a party may question his qualifications and methodology at trial; "even if they meet the *Daubert* threshold" they "are relevant to the 'credibility and weight of the opinion offered.'") (citing *Allstate Ins. Co. v. Maytag Corp.*, No. 98-cv-1462, 1999 WL 203349, at *3 (N.D. Ill. Mar. 30, 1999)). Nassanain thus remains qualified to testify as an expert.

Rebel next challenges Nassanian's methodology. Nassanian observed interactions between cheerleaders and their backpacks, physically examined the Rebel Dream Bag and its components, utilized his expertise in bag design and development, and compared the Dream Bag with other backpacks in several respects. [171-1] at 4–5. Rebel argues that Nassanian's methodology remains unreliable

21

because he only evaluated the backpack's functionality based upon its components, not in totality; Nassanian failed to consider alternative designs; and Nassanian only looked at the backpack and cheerleading in preparation for this lawsuit. [171] at 1–2.

Rebel's challenges lack merit. First, Nassanian states that he did evaluate the backpack's functionality in totality, as well as the bag's individual components, and the report confirms his assertion. [171-1] at 4–5, 20–21 ("The collection of each of these individual elements, as well as, more generally, the overall appearance, and look-and-feel of the backpack, are substantially entirely dictated by engineering considerations in pursuing the utilitarian and other benefits discussed above."). Likewise, Nassanian's report clearly included consideration of alternative designs, including a lack of contrasting colored zippers (*id.* at 7–8), a different radius for front pocket styles (*id.* at 9–10), and alternative locations for a side mesh pocket (*id.* at 12). Nassanian also considered other backpack designs. *Id.* at 5, 32–40. Finally, the fact that Nassanian's testimony was expressly developed for the purpose of testifying is not unusual; that is undoubtedly the case for most, if not all, retained expert witnesses. Though Nassanian had not previously worked with competitive cheerleading, he nonetheless possesses extensive experience with bag design and development, and with specialty athletic bags in particular. Again, Rebel's challenges

concerning Nassanian's field of specialty affect the weight to be placed on his opinion, not its admissibility. *Hall v. Flannery*, 840 F.3d at 929.

Contrary to Rebel's assertions, the Court finds that Nassanian's methodology meets the minimum requirements under *Daubert* and *Kuomo Tire*. Nassanian's methodology extensively considered his observations of the Rebel Dream Bag and other athletic bags, and Nassanian's extensive experience and knowledge within the field of bag design and development. This methodology creates no issues for reliability under *Daubert*. *See Kumho Tire*, 526 U.S. at 156 ("No one denies that an expert might draw a conclusion from a set of observations based on extensive and specialized experience."). Ultimately, Rebel's challenges to Nassanian's methodology and conclusions go to the opinion's weight, not its admissibility. *See Deputy v. Lehman Bros.*, 345 F.3d 494, 506 (7th Cir. 2003) ("Whether an expert's theory is correct is a factual question for the jury to determine.").

Finally, the Court notes that Nassanian's opinion fulfills the final requirement under *Daubert*, relevancy, as it provides helpful information regarding the functionality of Dream Bag's trade dress, a pivotal issue in the case. Therefore, Court finds that Nassanian's expert opinion is admissible under Rule 702 and *Daubert* and thus denies Plaintiff's motion to exclude.

## III.   Motion to Strike [155]

As part of discovery in this case, Karen Aldridge, Rebel's Founder, sole owner, and Chief Executive Officer, provided a deposition as Plaintiff's Rule 30(b)(6) designee. During the deposition, Aldridge responded "No" to the question, "Are you

aware of any instances where customers or prospective customers of either your cheer backpack, or Mr. Lundberg's It Bag, thought that they were purchasing one, but they were confused and purchased the other?" [156-1] at 41:8–22. Aldridge additionally responded "No," to the question, "Are you aware of instances where a customer contacted Rebel but had intended to contact Mr. Lundberg's company, CS Ath- -- Athletic or vice-versa?" *Id.* After Aldridge's deposition, Plaintiff served an errata sheet which modified Aldridge's answers to "Yes" for those questions, along with a question confirming Aldridge's response to the first question. [155-3] at 2, 3. Plaintiff additionally served two declarations of Rebel employees, who also sat for depositions. [155-5] (Matlon declaration); [155-6] (Murray declaration); [155-7] (Matlon deposition); [156-2] (Murray deposition). Defendant objected to the errata sheet and declarations and moved to strike the evidence. [81]. The Court initially denied the motion without prejudice, and Defendant refiled its motion in connection with the motion for summary judgment. [103]; [155].

Rule 30(e)(1)(B) allows for a witness to make "changes in form or substance" following their review of the deposition transcript. Fed. R. Civ. P. 30(e)(1)(B). A witness may "change his deposition from what he said to what he meant," or if the transcript contains an error, "such as dropping a 'not.'" *Thorn v. Sundstrand Aerospace Corp.*, 207 F.3d 383, 389 (7th Cir. 2000). On summary judgment, however, a court should "disregard substantive errata changes where the changes do not reflect errors in transcription." *United States ex rel. Robinson v. Indiana University Health*

*Inc.*, 204 F. Supp. 3d 1040, 1043 (7th Cir. 2016) (analyzing the *Thorn* opinion and other precedent on the issue).

At the time of Aldridge's deposition, she meant to answer "No" to questions asking if she knew of confusion between the Rebel Dream Bag and Lundberg's It Bag. Aldridge admits that she did not learn of any confusion until *after* the deposition. [155-3]. Therefore, the requested changes do not constitute a transcript error as described by *Thorn*, but an improper request to substantively rewrite deposition testimony. *Robinson*, 204 F. Supp. 3d at 1043. Accordingly, this Court may "disregard" such "substantive errata changes" in determining summary judgment. *Id.*; *see also Truly v. Sheehan*, 135 Fed. App'x 869, 871 (7th Cir. 2005).

This conclusion, however, does not strike the errata sheet itself from the record. The *Thorn* holding dictates "what evidence warrants consideration on summary judgment," but does not strike "an offending affidavit or errata sheet from the record." *Robinson*, 204 F. Supp. 3d 1040, 1042 at n.1. In effect, the Court declines to strike the errata sheet from the record, but the Court can properly disregard the errata sheet for the purpose of the summary judgment motion, thus precluding the evidence from raising a disputed issue of material fact. *Id.* at 1044 ("The sham affidavit doctrine and the *Thorn* extension were therefore developed to ensure that summary judgment procedure could not be undermined by clever counsel taking advantage of the extremely exacting requirement that there be 'no genuine dispute

as to any material fact.'") (quoting Fed. R. Civ. P. 56; and citing *Bank of Illinois v. Allied Signal Safety Restraint System*, 75 F.3d 1162, 1169 (7th Cir. 1996)).

Turning to the declarations from Murray and Matlon, Plaintiff seeks to introduce statements made by unknown third parties to Murray and Matlon for the truth that the unknown individuals confused Lundberg's It Bag with Rebel Dream Bag. These out-of-court statements clearly constitute inadmissible hearsay. *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted."); Fed. R. Evid. 802. And Plaintiff fails to explain why, despite their status as hearsay, the statement should nonetheless be admitted, thus waiving any such argument. *Braun v. Village of Palatine*, 56 F.4th 542, 553 (7th Cir. 2022) ("A litigant 'waives an argument by failing to make it before the district court.' This rule applies when 'a party fails to develop arguments related to a discrete issue' . . . .") (first citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011); and then citing *Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005) (finding waiver because party "did not present legal arguments or cite relevant authority to substantiate claim")) (citations omitted).

Even if Plaintiff addressed the issue of hearsay, there exists no sufficient basis to admit the statements made by the unknown declarants. The relevant evidence from Matlon's and Murray's declarations states as follows: "At the event, I asked one of the Technique Gems athletes where her bag was from. She was not sure but thought the bag was a Rebel bag. The bag referenced is pictured below. It is my

26

understanding that this is a CS Athletic bag."  [155-5] ¶¶ 3, 4 (picture omitted); "While I was working at the Rebel Booth, a parent approached me with a bag which she believed was a Rebel Dream Bag and asked me if Rebel could fix the bag as she thought the bag was a product of Rebel.  However, the bag was actually a CS Athletic Bag."  [155-6] ¶ 3; "While I was working at the Rebel popup store, I heard various cheer moms questioning whether the CS Athletic Bag was a product of Rebel as they thought it was a Rebel Dream Bag."  *Id.* ¶ 4; *see also* [155-7] (Matlon deposition); [156-2] (Murray deposition).

Statements by unknown individuals such as "I thought the CS Athletic Bag was a Rebel Dream Bag" fail to qualify as admissible non-hearsay or otherwise fall within a hearsay exception. *See* Fed. R. Evid. 801; Fed. R. Evid. 802. Therefore, the Court disregards such testimony. *Gunville v. Walker*, 583 F.3d 979, 985 (7th Cir. 2009) ("A party may not rely upon inadmissible hearsay to oppose a motion for summary judgment.").[5]

Given the admissibility of the witnesses' testimony and the effect on the motions for summary judgment, the Court finds that the issues relating to the Murray and Matlon declarations remain moot.

## IV.    Motions for Summary Judgment [144], [173]

A party seeking summary judgment must show that there exists no genuine "dispute as to any material fact and the movant is entitled to judgement as a matter

---

[5] Nevertheless, questions such as "Is this a Rebel bag?" and observations that a consumer brought a CS Athletic bag to Rebel's table do not constitute hearsay and thus remain admissible.  As described *infra*, however, these statements alone fail to create a genuine issue of material fact.

of law." Fed. R. Civ. P. 56(a); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A genuine dispute as to a material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there remains no genuine dispute as to any material fact. *See Celotex*, 477 U.S. at 323. In evaluating a motion for summary judgment, the Court must "construe all facts and reasonable inferences in the light most favorable to the nonmoving party," but a mere "scintilla of evidence" supporting the non-movant's position does not suffice. *Anderson*, 477 U.S. at 248. Instead, "there must be evidence on which the jury could reasonably find" for the non-moving party. *Id.* at 252. In a case involving cross-motions for summary judgment, the Court construes "all inferences in favor of the party against whom the motion under consideration is made." *Tegtmeier v. Midwest Operating Eng'rs Pension Trust Fund*, 390 F.3d 1040, 1045 (7th Cir. 2004).

Plaintiff alleges trademark infringement and unfair competition and false designation of origin under the Lanham Act, as well as state statutory and common law trademark infringement, unfair competition, and deceptive trade practices. [40] ¶¶ 25–42. Each of the claims at issue involves the "same elements and proofs." *KJ Korea, Inc. v. Health Korea, Inc.*, 66 F. Supp. 3d 1005, 1012–13 (N.D. Ill. 2014) (citing *AHP Subsidiary Holding Co.*, 1 F.3d at 619 (holding that the elements of a state unfair competition claim mirror those of federal statutory trademark infringement)); *Trans Union LLC v. Credit Research, Inc.*, 142 F. Supp. 2d 1029, 1038 (N.D. Ill. 2001)

(noting the "same analysis applies" to (1) federal trademark infringement claim; (2) federal unfair competition claim; (3) unfair competition and deceptive trade practice claims under Illinois law; and (4) trademark infringement and unfair competition claims under Illinois common law).

Under each of these theories, a plaintiff must prove that: (1) it has a protectable right in the asserted trademarks; and (2) the defendant's use of the mark is likely to cause confusion. *CAE, Inc. v. Clean Air Eng'g, Inc.*, 267 F.3d 660, 673–74 (7th Cir. 2001); *Packman v. Chicago Tribune Co.*, 267 F.3d 628, 638 (7th Cir. 2001). Registration of a trademark serves as "'prima facie evidence' of the mark's validity." *Iancu v. Brunetti*, 588 U.S. 388, 391 (2019).

After establishing a protectable right in the asserted trademark, the plaintiff must prove a "'likelihood of confusion' as to source, affiliation, connection or sponsorship of goods or services among the relevant class of customers and potential customers." *Sands, Taylor & Wood Co. v. Quaker Oats Co.*, 978 F.2d 947, 957 (7th Cir. 1992). When evaluating the likelihood of confusion, courts in the Seventh consider:

> (1) the similarity between the marks in appearance and suggestion; (2) the similarity of the products; (3) the area and manner of concurrent use; (4) the degree of care likely to be exercised by consumers; (5) the strength of the plaintiff's mark; (6) any evidence of actual confusion; and (7) the intent of the defendant to 'palm off' his product as that of another.

*Sorensen v. WD-40 Co.*, 792 F.3d 712, 726 (7th Cir. 2015). While "no single factor is dispositive," the similarity of the marks, the intent of the defendant, and evidence of

actual confusion are "especially important." *Id.* (citing *Ty, Inc. v. Jones Grp., Inc.*, 237 F.3d 891, 898 (7th Cir. 2001)). Likelihood of confusion "is a question of fact, appropriate for summary-judgment resolution only if no reasonable factfinder could decide for" the nonmoving party. *Uncommon*, 926 F.3d at 425.

### A. Rebel's '712 Registration

Defendant does not challenge that Plaintiff has a protectable right in the registered trademark nor dispute the validity of Plaintiff's '712 registration. Instead, Defendant argues that Plaintiff has not proved likelihood of confusion between Defendant's cheerleading backpack and Rebel's Dream Bag. The Court thus considers the likelihood of confusion factors.

### 1. Similarity of Marks

Under the first factor, "the test is not whether the public would confuse the marks, but whether the viewer of an accused mark would be likely to associate the product or service with which it is connected with the source of products or services with which an earlier mark is connected." *Sorensen*, 792 F.3d at 726 (quoting *AutoZone, Inc. v. Strick,* 543 F.3d 923, 929 (7th Cir. 2008)) (emphasis omitted). Courts "view the marks as a whole" and "in light of what happens in the marketplace." *Id.* (quoting *AutoZone*, 543 F.3d at 929). For "design marks which are not word marks and are not capable of being spoken, the question of the similarity of the marks must be decided primarily on the basis of *visual* similarity of the marks." *Longshore v. Retail Royalty Co.*, 589 Fed. App'x 963, 965–66 (Fed. Cir. 2014) (citing *In re ATV Network Ltd.*, 552 F.2d 925, 927 ((emphasis in original).

Plaintiff concedes that Defendant's It Bag "does not have" certain components of Rebel's registered mark, including the "hourglass shape or the horizontal zipper extending across the front panel of the bag." [178] ¶¶ 92, 93. A review of pictures comparing the bags confirms this fact:





[145] at 3 (Rebel's '712 registration; Defendant's It Bag). The lack of this distinctive hourglass shape particularly weighs in favor of Defendant. *See Ty, Inc. v. Jones Group, Inc.*, 237 F.3d 891, 898 (7th Cir. 2001) ("If one word or feature of a composite trademark is the salient portion of the mark, it may be given greater weight than the surrounding elements." (citing *Henri's Food Prods. Co., Inc. v. Kraft, Inc.*, 717 F.2d 352, 356 (7th Cir. 1983)). Indeed, the only material feature Defendant's bag shares with the '712 trademark remains the relative position and shape of the lower front pocket, a mundane, common feature, as Plaintiff concedes. [178] ¶¶ 72–74. Likewise,

the It Bag's silhouette remains consistent with a typical backpack, suggesting that the bag could come from anywhere. Additionally, not part of the '712 trademark, Rebel's bags include the company's "R" star logo on the front pocket; in contrast, the It Bag features "CS heart shaped logos as zipper pulls." [40] at 4; [152-2] at 2. Where there exists a "prominent display" of a brand name, that aspect weighs against likelihood of confusion. *See Grubhub Inc. v. Relish Labs LLC*, 80 F.4th 835, 849 (7th Cir. 2023).

Given that Defendant's bag lacks the Dream Bag's prominent hourglass shape and that the bags feature distinct source-identifying indicia, the products are not similar enough to warrant confusion when viewed as a whole. This factor weighs against Plaintiff.

### 2. Similarity of Products

The second factor asks "not whether the products are interchangeable, but whether the products are the kind the public might very well attribute to a single source." *Sorensen*, 792 F.3d at 728–29 (citing *AutoZone*, 543 F.3d at 931). On a product level, the bags are fundamentally the same and each functions as an athletic bag tailored to cheerleaders. Given these similarities, consumers could assume that Rebel owns the It Bag in addition to the Dream Bag. *Cf. AutoZone*, 543 F.3d at 931 ("The rights of an owner of a registered trademark extend to any goods or services that, in the minds of consumers, might be put out by a single producer."). But the same could be said about any bag geared to a specific athletic pursuit. This factor thus weighs in favor of Plaintiff, but not significantly.

### 3.  Area and Manner of Concurrent Use

This third factor considers "whether there is a relationship in use, promotion, distribution or sales between the goods or services of the parties," and "whether the parties use the same channels of commerce, target the same general audience, or use similar marketing procedures." *Sorensen*, 792 F.3d at 730 (quoting *CAE, Inc. v. Clean Air Eng'g Inc.*, 267 F.3d 660, 681 (7th Cir. 2001)).  The parties agree that their "prospective customers overlap in that both include cheerleading gyms," but Defendant argues the similarities end there since "Plaintiff's customers also include end-users whereas Mr. Lundberg does not sell his It Bag to end-users."  [192] ¶ 39.  The parties failed to develop their arguments as to this factor, but the record suggests that while the products share some aspects regarding channels of commerce, audience, and marketing, there also remain some differences.  The Court therefore considers the factor neutral.

### 4.  Degree of Care Exercised by Consumers

This fourth factor assumes that "the more widely accessible and inexpensive the products and services, the more likely that consumers will exercise a lesser degree of care and discrimination in their purchases."  *Sorensen*, 792 F.3d at 730 (quoting *CAE*, 267 F.3d at 683).  The parties failed to develop their arguments on this factor as well, and the record offers no information regarding the degree of care exercised by consumers.  *Braun v. Village of Palatine*, 56 F.4th 542, 553 (7th Cir. 2022) ("A litigant 'waives an argument by failing to make it before the district court.'  This rule applies when 'a party fails to develop arguments related to a discrete issue' . . . .")

(first citing *Alioto v. Town of Lisbon*, 651 F.3d 715, 720 (7th Cir. 2011); and then citing *Lekas v. Briley*, 405 F.3d 602, 614 (7th Cir. 2005) (finding waiver because party "did not present legal arguments or cite relevant authority to substantiate claim")) (citations omitted).  This factor thus remains neutral in the Court's analysis.

### 5.  Strength of Rebel's Mark

This factor "refers to the mark's distinctiveness, meaning its propensity to identify the products or services sold as emanating from a particular source." *Sorensen*, 792 F.3d at 731 (quoting *CAE*, 267 F.3d at 684).  Since the Plaintiff's trademark constitutes a product design, its distinctiveness depends upon whether the mark has acquired secondary meaning.  *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 216 (2000).  The only relevant evidence concerning the '712 trademark's secondary meaning comes from the Wallace survey, which focused on the Dream Bag's trade dress.  According to the Wallace survey, "61% of respondents believe that the Plaintiff's product in question has established secondary meaning." [152-7] at 14.  The survey suggests that the bag overall has some strength as a mark, though again, the survey focused on the bag, and not the '712 trademark.  Without more concrete evidence of the mark's secondary meaning, the Court finds this factor factors only mildly in Plaintiff's favor.

### 6.  Evidence of Actual Confusion

Though not required to prove likelihood of confusion, evidence of actual confusion, where it exists, remains "entitled to substantial weight in the likelihood of confusion analysis."  *CAE*, 267 F.3d at 685.

34

Plaintiff's actual confusion evidence includes the errata sheet by Aldridge and the testimony of employees Matlon and Murray. *See* [178] ¶¶ 95, 101, 102. As discussed *supra*, the Court disregards Aldridge's errata sheet as well as the inadmissible hearsay describing consumer confusion between Rebel's bag and Lundberg's bag. The remaining admissible evidence from these sources consists of consumers' questions asking if the Rebel and CS Athletic bags were the same,[6] Murray's observation that a consumer brought a CS Athletic Bag to a Rebel booth for repair, and Aldridge's original answer that she was unaware of any instances of actual consumer confusion. The admissible consumer questions and Aldridge's original answer fail to establish any instances of actual consumer confusion. In contrast, Murray's observation could imply evidence of consumer confusion, even in the absence of the consumer's inadmissible hearsay statement. One could understand the consumer's action of bringing a Lundberg bag to the Rebel booth as evidence that the consumer believed the Rebel Dream Bag and It Bag constituted the same product. Other interpretations abound, however, and many would not support actual consumer confusion.[7] While the Court must construe inferences here in favor of Plaintiff, summary judgment also constitutes the "put up or shut up" moment of the litigation, *Brown v. CACH, LLC*, 94 F.4th 665, 667 (7th Cir. 2024), and this

---

[6] These questions remain nonhearsay to the extent they do not constitute assertions that Plaintiff's and Defendant's bags look the same or that consumers confuse the bags. If the questions function as assertions, they amount to inadmissible hearsay. *See United States v. Pulliam*, 973 F.3d 775, 783 (7th Cir. 2020) ("If the remark is intended to assert information, it is a statement rather than a question" and constitutes hearsay. (citing *United States v. Summers*, 414 F.3d 1287, 1300 (10th Cir. 2005))).

[7] For example, the consumer could think that the Rebel booth could repair any cheerleading bag regardless of brand, or believed that Rebel and Lundberg offered reciprocal repairs, even though the consumer understood the bags remained separate products.

singular suggestion of actual consumer confusion offers weak evidence of actual confusion.

Plaintiff additionally points to the Wallace survey, which focused on the Rebel Bag's trade dress, and the finding that "58.0% of respondents believe that the Plaintiff's and Defendant's products come from the same or affiliated sources, confirming that a likelihood of confusion exists between the products in question." [152-7] at 18. Though the Wallace survey did not focus on the '712 registered trademark, the results suggest some actual consumer confusion as to the bag's overall appearance, which reflects Rebel's '712 trademark. Therefore, this factor weighs toward likelihood of confusion, though not as strongly as if the actual consumer confusion focused on the '712 trademark.

### 7. Bad Faith Intent

Finally, the last factor "focuses on evidence that the defendant is attempting to pass off its product as having come from the plaintiff. Mere knowledge of someone else's mark is insufficient to show intent to pass off." *Sorensen*, 792 F.3d at 731 (first citing *Packman v. Chicago Tribune Co.,* 267 F.3d 628, 644 (7th Cir. 2001); and then citing *Barbecue Marx, Inc. v. 551 Ogden, Inc.,* 235 F.3d 1041, 1046 (7th Cir. 2000)) (citations omitted).

Plaintiff alleges that Defendant developed the It Bag with the intent to copy the Rebel Dream Bag, and Defendant concedes that he offered Plaintiff's bag to his designer as an example of successful bags in the cheerleading bag market. [197] ¶¶ 3, 12. But Lundberg also told his designer that he wanted his "own" bag, not just a

copy of Rebel's, and the record provides no evidence that Lundberg intended or tried to copy the '712 trademark's features, including the hourglass shape and horizontal zipper, [197] ¶¶ 3, 4, neither of which appear in Defendant's bag. Certainly, Plaintiff has offered no evidence to suggest that Lundberg sought to pass off the It Bag as a Rebel bag. This factor thus weighs against likelihood of confusion.

### 8. Weighing the Factors

Overall, the record splits the likelihood of confusion factors, but "Courts may assign varying weight to each of the factors depending on the facts presented." *Grubhub*, 80 F.4th at 847. Given the Plaintiff's concession that Defendant's bag lacks the distinctive feature of the '712 trademark, the dissimilarity of the marks weighs strongly against likelihood of confusion. Even though the record includes evidence showing at least one instance of consumer confusion, that confusion remained focused on Plaintiff's overall bag, not Plaintiff's trademark. Further, since the Plaintiff bears the burden of proving likelihood of confusion, the several neutral factors—whether due to insufficient evidence or argument—ultimately favor Defendant's position that no likelihood of confusion exists.

Accordingly, after weighing the factors, the Court concludes that a "reasonable factfinder could" find no likelihood of confusion on this record. *Uncommon II*, 926 F.3d at 427 (agreeing with the district court's "ultimate conclusion" that no likelihood confusion existed where the "marks are, at most, barely similar, and they are too weak to confuse any purchaser, especially in the absence of evidence of any

intentional freeloading"). Plaintiff's inability to demonstrate a likelihood of confusion dooms its trademark infringement claim.

Accordingly, as to Count I, the Court denies Plaintiff's motion for summary judgment and grants Defendant's motion for summary judgment.

### B. Rebel's Dream Bag Unregistered Trade Dress Trademark

Since Plaintiff asserts a protectable trademark in its unregistered trade dress, "plaintiff has the burden to establish its entitlement to protection under the Lanham Act based on the 'distinctiveness' of the mark." *Holbrook Mfg. LLC v. Rhyno Mfg.*, 497 F. Supp. 3d 319, 330 (N.D. Ill. 2020) (quoting *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 727 (7th Cir. 1998)). Any trademark for "trade dress," a category that includes product design, only receives protection under § 43(a) with "a showing of secondary meaning." *Wal-Mart Stores, Inc. v. Samara Bros., Inc.*, 529 U.S. 205, 209, 214 (2000).

Secondary meaning, or acquired distinctiveness, results where "consumers have come to 'uniquely associat[e]' the mark with a single maker." *Uncommon, LLC v. Spigen, Inc.*, 926 F.3d 409, 424 (7th Cir. 2019) (quoting *Two Pesos, Inc. v. Taco Cabana, Inc.*, 505 U.S. 763, 766 n.4 (1992)) (alteration in original). A party can prove secondary meaning "through direct consumer testimony, consumer surveys, length and manner of use, amount and manner of advertising, volume of sales, place in the market, and evidence of intentional copying." *Id.* (citing *Platinum Home Mortgage Corp. v. Platinum Financial Group, Inc.*, 149 F.3d 722, 728 (7th Cir. 1998)). Whether a product has acquired secondary meaning "is a question of fact, and thus summary

38

judgment is appropriate only if no reasonable factfinder could decide" for the nonmoving party. *Id.* (citing *Thomas & Bets Corp. v. Panduit Corp.*, 138 F.3d 277, 292 (7th Cir. 1998)).

Even if a mark acquires secondary meaning, a "functional" mark faces an absolute bar to trademark protection. *Qualitex Co. v. Jacobson Prods Co., Inc.*, 514 U.S. 159, 164 (1995) (citing *Inwood*, 456 U.S. at 850 n.10). The "*Inwood* formulation" states that a "product feature is considered functional and is ineligible for trademark protection 'if it is essential to the use or purpose of the article or if it affects the cost or quality of the article.'" *Flexible Steel Lacing Company v. Conveyor Accessories, Inc.*, 955 F.3d 632, 644 (7th Cir. 2020) (first quoting *TrafFix Devices, Inc. v. Marketing Displays, Inc.*, 532 U.S. 23, 33 (2001); and then quoting *Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844, 850 n.10 (1982)). Aesthetic functionality also arises if "the exclusive use of the feature would place competitors at a 'significant non-reputation-related disadvantage.'" *Id.* (quoting *TrafFix*, 532 U.S. at 33).

Courts evaluate functionality using several factors, though none is dispositive. *Id.* These factors include:

> (1) the existence of a utility patent . . . ; (2) the utilitarian properties of the item's unpatented design elements; (3) advertising of the item that touts the utilitarian advantages of the item's design elements; (4) the dearth of, or difficulty in creating, alternative designs for the item's purpose; (5) the effect of the design feature on an item's quality or cost.

*Georgia-Pacific Consumer Products LP v. Kimberly-Clark Corp.*, 647 F.3d 723, 727–28 (7th Cir. 2011) (quoting *Specialized Seating Inc. v. Greenwich Industries, L.P.*, 472 F. Supp. 2d 999, 1011 (N.D. Ill. 2007). Where the asserted trade dress "affects the

39

cost or quality of a product," it "remains 'functional even if other solutions to the design problems are available to competitors.'" *Flexible Steel*, 955 F.3d at 645 (quoting *Arlington Specialties, Inc. v. Urban Aid, Inc.*, 847 F.3d 415, 419 (7th Cir. 2017)). Courts must ask not "whether the claimed trade dress has 'less utility' than alternatives," but "whether the design feature affects product quality or costs or is 'merely ornamental.'" *Arlington Specialties*, 847 F.3d at 420 (quoting *McAirlaids, Inc. v. Kimberly-Clark Corp.*, 756 F.3d 307, 312 (4th Cir. 2017)). While "functionality is a factual question," it can often be decided as a matter of law because "the bar for functionality is so low." *Arlington Specialties*, 847 F.3d at 419.

Plaintiff alleges a protectable trade dress in "the overall image and appearance of" the Rebel Dream Bag, including but not limited to "color, shape, size, texture, and graphics." [178] ¶ 1. Specifically, the alleged trade dress incorporates the following elements:

> (i) a large, smooth, unobstructed space on the front for team logos to be placed; (ii) that the bag is frontloading and does not have to be placed on its side or back to load items in; (iii) feminine hourglass shape visually appearing in a contrasting color; (iv) a shoe compartment with a unique functionality that is mesh ventilated and is hidden and can pop out and be unzipped; (v) placement of the shoe compartment; (iv) contrasting color zipper pocket outlines; (vi) front pocket style and placement; (vii) side mesh pocket style and placement; (viii) auxiliary side pocket style and placement; (ix) glitter fabric; (x) interior fabric monogramming pattern; and (xi) hairbow clip placement.

*Id.* (internal quotations omitted).

The parties' evidence regarding the functionality of Dream Bag's trade dress largely comes from dueling expert reports reaching opposite conclusions. [148-1]; [148-2]; [171-1]. Defendant's expert, Hrag Nassanian, described *supra*, concludes

that the asserted trade dress is functional based upon the functionality of the individual components and overall trade dress, comparison with alternative designs, and Plaintiff's advertising regarding the bag's functionality. [171-1].

In response, Plaintiff's expert, Uli Becker, criticizes Nassanian's methodology and analysis. Additionally, Becker concludes that the trade dress is not functional due to the existence of alternative designs in the marketplace. [148-1]. Specifically, for each element of the trade dress that Nassanian opines is functional, Becker concludes the opposite because another "competitor in the market does not employ" that feature and thus "there is a comparative alternative" and "effective competition. Therefore, this feature does not exhibit aesthetic functionality. Additionally, the existence of alternative designs shows that that [*sic*] this feature does not exhibit utilitarian functionality." [148-1] at 7 (contrasting color zippers); *see also id.* at 8 (side mesh pocket, auxiliary side pocket, style and placement); *id.* at 9 (glitter fabric); *id.* at 10 (shoes compartment style and placement); *id.* at 10 (snap hook style and placement); [148-2] at 11 (same); *id.* at 11–12 (stand up on its own and front-loading feature); *id.* at 12–13 (overall appearance).

According to Becker's report, the mere existence of alternative designs forms the factual basis for his conclusion. The opinion offers no additional reasoning, analysis, or detail about why the alternative designs—only one of several functionality factors—support a conclusion of non-functionality. When "an expert report" "lacks foundation and depth," it will "be given little consideration by courts." *Bourke v. Conger*, 639 F.3d 344, 347 (7th Cir. 2011); *see Vollmert v. Wis. DOT*, 197

F.3d 293, 298 (7th Cir. 1999) ("For an expert report to create a genuine issue of fact, it must provide not merely the conclusions, but the basis for the conclusions.").

Notably, the basis for Becker's conclusion—that functionality cannot exist if alternative designs compete in the marketplace—ignores well-established law. The existence of alternative designs remains just one of several factors a court must consider and does not determine the issue alone. *Georgia-Pacific Consumer Products*, 647 F.3d at 731 ("The design in question does not have to be the *only* possible design to be functional; rather, it is functional if it 'represents *one of many solutions* to a problem.'" "The fact that there are numerous alternative designs does not, on its own, render the design nonfunctional and incidental.") (quoting *Specialized Seating, Inc. v. Greenwich Industries, LP*, 616 F.3d 722, 727 (7th Cir. 2010)) (emphasis in original). In fact, "once established to affect the cost or quality of the product, the asserted trade dress is 'functional even if other solutions to the design problems are available to competitors.'" *Flexible Steel Lacing Co. v. Conveyor Accessories, Inc.*, 955 F.3d 632, 650 (quoting *Arlington Specialties*, 847 F.3d at 419). Therefore, the existence of alternative designs alone remains insufficient to prove non-functionality.

Turning to the other functionality factors, Plaintiff offers no evidence, other than Becker's report pointing to alternative designs, to support non-functionality. *See* [192] ¶¶ 27, 26. In contrast, Nassanian's expert report illustrates how design elements of Rebel's trade dress "affects the cost or quality" of the bag. For example, the size and placement of Dream Bag's pockets could affect manufacturing costs, *see supra* note 4, the quality of a user's interaction with the bag, [171-1] at 12–13, and

the quality of highlighting artwork or graphics on the bag. *Id.* at 11. Plaintiff offers no evidence, argument, or discussion to rebut Nassanian's points or otherwise dispute these facts or opinions.

Plaintiff generally argues that, even if the Court rejects non-functionality of the individual trade dress elements, it should nonetheless find the overall trade dress to be non-functional. But where "the whole is nothing other than the assemblage of functional parts, and where even the arrangement and combination of the parts is designed to result in superior performance, it is semantic trickery to say that there is still some sort of separate 'overall appearance' which is non-functional." *Minemyer v. B-Roc Representatives, Inc.*, 678 F. Supp. 2d 691, 703 (N.D. Ill. 2009) (quoting *Leatherman Tool Group, Inc. v. Cooper Industries, Inc.*, 199 F.3d 1009, 1013 (9th Cir. 1999).

Viewing the record as a whole, Plaintiff has not carried its burden to establish the non-functionality of Dream Bag's trade dress. Plaintiff claims the trade dress has aesthetic and utilitarian functionality, but it fails to offer evidence to support the point, and a motion for summary judgment is the "put up or shut up moment in the life of a case." *Black & Decker Corp. v. Positec USA Inc.*, No. 11-CV-5426, 2015 WL 1543262, at *24 (N.D. Ill. Mar. 31, 2015) (quoting *AA Sales & Assocs., Inc. v. Coni–Seal, Inc.,* 550 F.3d 605, 612–13 (7th Cir. 2008)).

Having found that Plaintiff has not, and cannot, show that a genuine issue of material fact exists on the issue of functionality, the Court denies Plaintiff's motion

for summary judgment and grants Defendant's motion for summary judgment as to Counts II and III.

## V. Plaintiff's Request to File a TAC

Following the parties' cross motions for summary judgment on an agreed schedule (and the completion of discovery), the Court denied as moot Plaintiff's motion for leave to file a third amended complaint. [164]. In a subsequent status report, Plaintiff indicated a continued desire to amend the complaint again, despite the motions for summary judgment; Defendant opposed any further amendment. [168]. Plaintiff's proposed TAC explicitly alleges claims for trade dress infringement, provides additional detail of the trade dress, and eliminates the '712 trademark infringement claim. [75-1]. None of these proposed changes affect the Court's ruling regarding the non-functionality of Dream Bag's trade dress. In light of the record and Court's prior rulings, the Court denies Plaintiff's request to file the TAC, and further finds the proposed amendment would be futile given the Court's ruling on functionality. Therefore, the Court declines to reconsider its original decision to deny Plaintiff's motion. [164].

## VI.    Conclusion

For the reasons explained above, this Court denies Defendant's motion to strike as moot [155], denies the parties' motions to exclude [159], [171], grants Defendant's motion for summary judgment [144], and denies Plaintiff's cross motion for summary judgment, [173]. The Clerk shall enter judgment in favor of Defendant and against Plaintiff on all claims. All dates and deadlines are stricken. Civil case terminated.

Dated: February 11, 2026                      Entered:

John Robert Blakey
United States District Judge